**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| Dzidra Fuller, on behalf of herself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. |
| vs. | ) ) | **JURY TRIAL DEMANDED** |
| Jui Li Enterprise Company, Ltd.; Tong Yang Industry Co., Ltd.; Gordon Auto Body Parts Co., Ltd.; Auto Parts Industrial, Ltd.; Cornerstone Auto Parts, LLC; and TYG Products, L.P., | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

---

## INDIRECT-PURCHASER PLAINTIFF'S CLASS ACTION COMPLAINT

Plaintiff Dzidra Fuller brings this action on her own behalf and on behalf of all those similarly situated to recover damages and obtain injunctive relief for Defendants' violations of state and federal laws against Defendants as follows:

### INTRODUCTION

1.     Plaintiff brings this action individually and on behalf of a class of plaintiffs consisting of all persons and entities in California, who purchased for end use aftermarket automotive sheet metal parts ("AM Sheet Metal Parts"), also known as AM crash parts, indirectly from Defendants starting at least as early as January 1, 2003 through the present (the "Class Period").  AM Sheet Metal Parts include, but are not limited to, hoods, doors, fenders, bonnets, floor panels, trunk assemblies, trunk lids, tailgates, roof panels, and reinforcement parts.

2.    This lawsuit involves an anticompetitive conspiracy among Defendants to illegally inflate the prices of AM Sheet Metal Parts in blatant disregard of California's antitrust and common laws and U.S. antitrust law.  Defendants and their co-conspirators agreed to and did in fact fix, raise, maintain and stabilize prices at which AM Sheet Metal Parts would be sold. Defendants simultaneously conspired to fix output of AM Sheet Metal Parts.

3.    This lawsuit is based on direct evidence demonstrating Defendants' conspiracy to artificially manipulate the market for AM Sheet Metal Parts.  Specifically, Defendants admit that they abandoned competing with one another in favor of an agreement among themselves to cooperate and coordinate in the manufacture and sale of AM Sheet Metal Parts. This arrangement, explained Raymond Wu, president of the Tong Yang Group, allowed Defendants to escape "malicious price cutting competition," thus achieving very high profitability on AM Sheet Metal Parts.

4.    Through these illegal acts, Plaintiff and members of the proposed Classes paid and continue to pay artificially inflated prices that exceeded the amount they would have paid if a competitive market had determined prices for AM Sheet Metal Parts.  Plaintiff and the proposed Classes suffered the type of injury that the antitrust and common law are designed to prevent.

## JURISDICTION AND VENUE

5.    This Court has diversity subject-matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, which amends 28 U.S.C. § 1332 to add a new subsection (d) conferring federal jurisdiction over class actions where, as here, "any member of a class of Plaintiffs is a citizen of a State different from any defendant" and the aggregated amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs.  *See* 28

U.S.C. § 1332(d)(2) and (6). This Court also has jurisdiction under 28 U.S.C. § 1332(d) because "one or more members of the class is a citizen of a state within the U.S. and one or more of the Defendants is a citizen or subject of a foreign state." Finally, the Court has personal jurisdiction over the parties because Plaintiff submits to the jurisdiction of the Court and Defendants systematically and continually conduct business here and throughout the U.S., including marketing, advertising, and sales directed to people and businesses in California.

6.      Venue is proper in this Judicial District given that Defendants reside, transact business, and/or are found within this District, and a substantial part of the events giving rise to the claims arose in this District.

7.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

8.      Venue is proper in this Judicial District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C § 1391(b), (c) and (d) because, during the Class Period, one or more Defendants resided in this district, all Defendants transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

9.      This Court has personal jurisdiction over each Defendant because each Defendant: (a) transacted business throughout the United States, including in this District; (b) participated in the sale and distribution of AM Sheet Metal Parts throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an anticompetitive conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## PLAINTIFF

10.     Plaintiff Dzidra Fuller is a California resident who, during the Class Period, purchased AM Sheet Metal Parts indirectly and for end use from one or more of the Defendants or their controlled subsidiaries.  Specifically, on or about February 6, 2012, Ms. Fuller replaced the bumper of her 2001 Nissan Sentra at Crocketts Premier Auto Body located at 900 San Pablo Ave., Pinole, California. Ms. Fuller purchased a "non-OEM cover, front bumper" and paid amounts of $98.00 for "Sheet Metal" and $226.50 for "Non-OEM."  Ms. Fuller paid a total of $843.33 for these repairs. On information and belief, Crocketts Premier Auto Body purchases its sheet metal parts from Keystone Automotive Industries, Inc..  As a result of the conspiracy, Fuller has been economically injured.

## DEFENDANTS

### The TYG Defendants

11.     Defendant Tong Yang Industry Co., Ltd. ("Tong Yang") is a corporation organized and existing under the laws of Taiwan with its principal place of business located at 98, An Ho Road, Sec. 2, Tainan, Taiwan. Tong Yang is the flagship firm of the "Tong Yang Group" ("TYG") – one of the largest auto-parts conglomerates in Taiwan with US$500 million in annual revenue and 1,480 employees. Both Tong Yang and TYG are traded as public companies on the Taiwan Stock Exchange. In September 2010, Tong Yang merged with its fellow TYG affiliate, Taiwan Kai Yih Industrial Co. Ltd. ("TKY"), pursuant to a stock purchase agreement.  Under the terms of the merger, Tong Yang became the surviving entity and expressly assumed all rights and potential liabilities of TKY. References to Tong Yang herein prior to September 2010 refer to its predecessor, TKY.  Tong Yang holds itself out as the largest

manufacturer of AM Sheet Metal Parts, holding the dominant share of that market. Tong Yang manufactures AM Sheet Metal Parts in Taiwan and exports them for sale around the world, including the United States. In fact, Tong Yang's top seven customers are in North America. Tong Yang shipped and sold over 87% of its product to the United States. During the Class Period, Tong Yang sold AM Sheet Metal Parts to Class members in the United States.

12. Defendant TYG Products, L.P. ("TYG Products") is a corporation organized and existing under the laws of the State of Texas with its principal place of business located at 1800 North McDonald Street, McKinney, Texas 75069. During the Class Period, TYG Products manufactured, imported, distributed and sold AM Sheet Metal Parts to Class members in the United States. TYG Products is a wholly owned subsidiary of TYG and was established to meet North America market demand.

**The Gordon Defendant**

13. Defendant Gordon Auto Body Parts Co., Ltd. ("Gordon Taiwan") is a corporation organized and existing under the laws of Taiwan with its principal place of business located at No. 48 Nieh Hsi Road, Lu Chu Hsiang, Taoyuan Hsien, Taiwan. Gordon Taiwan imports, distributes and sells, throughout the United States, AM Sheet Metal Parts imported from Taiwan. Gordon was established in 1986 and is "one of the biggest manufacturers of metal replacement crash parts in the world...and employs more than four hundred people." North America is Gordon's "biggest market" and has annual revenues of over US$100 million. In 2008, Gordon was recognized for providing the U.S. market with more CAPA-Certified parts than any other manufacturer. The term "Gordon Taiwan" includes any wholly or partly owned subsidiary of Gordon Taiwan involved in the market for AM Sheet Metal Parts whose business operations

were controlled by Gordon Taiwan at any time during the Class Period. During the Class Period, Gordon Taiwan sold AM Sheet Metal Parts to Class members in the United States.

***The API Defendants***

14. Defendant Auto Parts Industrial, Ltd. ("API") is a corporation organized and existing under the laws of Taiwan with its principal place of business located at No. 456, Sec. 2, Kwoling Rd., 7 Lin, Kwo Ling Li, Jhongli City, Taoyuan County 320, Taiwan. API was founded in 1979. Through the 1980s, 1990s and 2000s, API merged with a number of companies engaged in sheet metal manufacturing to become one of the largest manufacturers of AM Sheet Metal Parts. API employs over 350 people and generates over US$132 million a year in revenue. API imports, distributes and sells throughout the United States AM Sheet Metal Parts imported from Taiwan.

15. API's largest customers include LKQ Corporation, which held approximately 50% of API's United States business in 2008. One of LKQ Corporation's current subsidiaries, Keystone Automotive Industries, Inc., holds itself out as the United States' largest aftermarket parts suppliers. The term "API" includes any wholly or partly owned subsidiary of API involved in the market for AM Sheet Metal Parts whose business operations were controlled by API at any time during the Class Period. During the Class Period, API sold AM Sheet Metal Parts to Class members in the United States.

16. Defendant Cornerstone Auto Parts, LLC ("Cornerstone") is a corporation organized and existing under the laws of the State of Texas with its principal place of business located at 1801 Royal Lane, #608, Dallas, Texas 75229. Cornerstone is a wholly owned subsidiary of Defendant API and it operates as API's "US business office." The term "Cornerstone" includes any wholly or partly owned subsidiary of Cornerstone involved in the

market for AM Sheet Metal Parts whose business operations were controlled by Cornerstone at any time during the Class Period. During the Class Period, Cornerstone distributed and sold to Class members throughout the United States AM Sheet Metal Parts.

### The Jui Li Defendant

17.     Defendant Jui Li Enterprise Company, Ltd. ("Jui Li") is a corporation organized and existing under the laws of Taiwan with its principal place of business located at No. 22, Kaonan Road, Jenwu Hsiang, 814 Kaohsiung, Kao-hsiung shih, Taiwan. Jui Li is a leading manufacturer of AM Sheet Metal Parts, which it manufactures in Taiwan and China and exports for sale around the world, including the United States. Jui Li produces a comprehensive array of AM Sheet Metal Parts including automotive panels, such as doors, hoods, fenders, trunk lids, and floor panels. Jui Li was established in 1970 and operates plants in Kaohsiung, Hsin-Chu, Hainan and Wuhan. Jui Li is traded as a public company on the Taiwan Stock Exchange. Jui Li has annual revenues exceeding US$132 million and employs more than 1000 people. The term "Jui Li" includes any wholly or partly owned subsidiary of Jui Li involved in the market for AM Sheet Metal Parts whose business operations were controlled by Jui Li at any time during the Class Period. During the Class Period, Jui Li sold AM Sheet Metal Parts to Class members in the United States.

### Agents and Co-Conspirators

18.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were

actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

19. All acts alleged in this Complaint to have been done by Defendants were performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of Defendants' business affairs.

20. Defendants carried out their illegal scheme with the assistance, coordination and cover of several trade industry groups including the Sheet Metal Parts Alliance ("SMPA"), the Taiwan Auto Body Panels Association ("TABPA"), and the Automotive Aftermarket Products Expo ("AAPEX"). The trade groups facilitated the conspiracy, providing platforms for meetings to facilitate output-reduction and price-fixing coordination.

21. On information and belief, various other companies and individuals, not named as Defendants in this Complaint, may have participated as co-conspirators in the acts complained of herein, and performed acts and made statements in furtherance of such conspiracy.

## TRADE AND COMMERCE

22. The activities of Defendants that are the subject of this action are within the flow of, and substantially affected, interstate trade and commerce within the United States and California, including trade and commerce to, from, and within this District.

23. The automotive aftermarket industry is considerable. Sales of aftermarket automotive products in the United States are in the billions of dollars (US) annually for the over 225 million vehicles operated in the United States.

24. AM Sheet Metal Parts represent a large portion of the entire aftermarket automotive parts market, with over US$400 million in sales in the United States in 2008.

25. The named Defendants manufacture over 95% of all AM Sheet Metal Parts sold in the United States, and their anticompetitive conduct substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

## THE MARKET FOR AM SHEET METAL PARTS

26. There are over 225 million vehicles in the United States. As vehicles age or are involved in collisions, they may require new parts. The market for replacement parts, otherwise known as the "crash-parts market," is divided into three main areas: (1) original equipment manufacturer parts ("OEM parts"), which are often distributed through the auto manufacturers' own service channels and sold under their brand names; (2) used or refurbished OEM parts; and (3) aftermarket parts, which have the same specifications as OEM parts but are usually not manufactured by OEMs or sold with automaker certification.

27. AM Sheet Metal Parts represent a significant portion of the entire aftermarket automotive "crash-parts market." AM Sheet Metal Parts include, but are not limited to, hoods, bonnets, fenders, bumpers, doors, tailgates, roof panels, floor panels and reinforcement parts. AM Sheet Metal Parts are less expensive than OEM parts because aftermarket companies specialize in such parts and tend to redesign and make more cost efficient changes as compared to the OEM parts, resulting in cheaper prices.

28. At all relevant times, AM Sheet Metal Parts market has been a highly concentrated oligopoly controlled by the named Defendants. Defendants' AM Sheet Metal Parts comprise the vast majority (over 95%) of all AM Sheet Metal Parts sold in the United States. This high degree of concentration facilitated the anticompetitive conduct alleged herein because it is relatively easy for a limited group of sellers to reach agreement on output and prices and to monitor adherence to such illegal agreement.

## EVIDENCE OF DEFENDANTS' ILLEGAL CONDUCT

*A Market Highly Conducive to Conspiracy*

29.     Beginning in at least 2003, Defendants and their co-conspirators—all of whom are purported horizontal competitors—devised an illegal conspiracy to artificially inflate or maintain prices for AM Sheet Metal Parts. Defendants facilitated their anticompetitive conspiracy by:  (1) creating and participating in anticompetitive joint "alliances" to develop tools for making AM Sheet Metal Parts, to implement artificial barriers to entry by non-defendants, and to meet and discuss confidential market information, supply chain management and negotiation with customers;  (2) engaging in secret meetings where they discussed and entered into illegal pricing and output agreements with each other, such as agreeing to "floor prices" below which no Defendant would sell their Parts; agreeing to simultaneous price increases, to be falsely attributed to rising input costs; and enforcing penalties for Defendants that cheated on the agreements; and (3) forming a production arrangement, called the "Unified Tooling" program, to curtail competition for AM Sheet Metal Parts by agreeing to limit the number of Defendants producing Parts.  All Defendants participated in the anticompetitive "alliances," meetings, or production schemes.

30.     An environment conducive to Defendants' conspiracy can be traced back almost 30 years, when many small companies in and around the southern Taiwan city of Tainan grew together to become major international AM Sheet Metal Parts manufacturers. Smaller manufacturers were acquired by Defendants, increasing the market concentration over time.  For example, Defendant API acquired at least five AM Sheet Metal Parts manufacturers from 1986 to 2001 to become one of the largest manufacturers of AM Sheet Metal Parts.  As a result, the market for AM Sheet Metal Parts in Taiwan became highly concentrated.

31.     Today, Taiwan is the biggest and most important production base, or manufacturing center, for AM Sheet Metal Parts in the world.  The geographic concentration of a well-established cluster of AM Sheet Metal Parts manufacturers in the southern part of the island is highly conducive to an anticompetitive conspiracy.  Raymond Wu, president of TYG, whose AM Sheet Metal Parts arm is Defendant Tong Yang (formerly known as TKY), explained in a 2003 Taiwan Economic News article how the Taiwanese aftermarket parts manufacturers clustering helps them to price in tandem to closely cooperate and "escape blood-shedding price competition":

> Now the world's strongest AM auto-parts production citadel, according to [Raymond] Wu, Taiwan comes close to monopolizing the global AM parts market and is largely able to escape any negative impact from foreign-exchange fluctuations because almost all major makers in the AM sector are from Taiwan and thus their quotation bases move in tandem, providing strong pricing power.

> Wu points out that most local major makers of AM auto parts in southern Taiwan's industry cluster have similar backgrounds. Their founding personnel were previously with traditional makers in the auto sector.  They were focused on export sales right from the early years.  They gradually expanded production scale with increased global demand, constantly upgrading their production techniques and finished-product quality, constantly accelerating and strengthening their product-development capabilities, and have also become engaged in OE parts supply to international automakers after gaining a solid foothold in the AM market. After about 30 years of strenuous efforts, Wu says, many small companies in and around the southern Taiwan city of Tainan have grown to become major international OE/AM parts suppliers.

> * * *

> Taiwan's AM-parts industry is also now implementing a more sophisticated international marketing strategy, moving away from exclusive reliance on low prices to attract customers.  *In the past, Wu explains, most local AM-parts makers competed with one another by cutting prices no matter how strong the global demand was, to "steal" market share from each other, but now the situation has changed, makers have abandoned this approach, and the profit margins of major local AM-parts makers parallel or even outstrip those of high-tech product makers on the island.*

> One of the best examples is Taiwan Kai Yih Industrial Co., Ltd., an affiliate of Tong Yang and one of the island's major AM sheet-metal body-parts makers. Kai Yih is a relative newcomer among major counterparts in Taiwan but ***the company***

*skillfully utilizes Tong Yang Group's resources and advantages in mold/die development and closely cooperates with local counterparts to escape the blood-shedding price competition, thus achieving very high profitability*, Wu explains. [emphasis added]

32.     The anticompetitive production arrangement between TYG and Defendant Tong Yang (then TKY) was described in the same 2003 article as follows:

> Wu Jun-ji, chairman of Ta Yih Group, was with Tong Yang earlier in his career before he stepped out of the group to set up one of the island's first motorcycle and auto-lamp factories. *With close ties with Tong Yang, Wu jun-ji insists that all of the affiliates in the Ta Yih Group only produce items that Tong Yang does not, to escape destructive in-group competition. With this tacit understanding between Ta Yih and Tong Yang,* Wu Jun-ji says, the two groups cooperate closely in joint marketing development by sharing marketing expenses and together offering a more comprehensive product line. (emphasis added).

## Anticompetitive Joint "Alliances"

33.     The ties between Defendants are strong.  Since at least 2003, Defendants set up what they call "cooperative initiatives" and "strategic alliances." Defendants used their cooperative arrangements as opportunities to strengthen their control of the market to collude on AM Sheet Metal Parts and facilitated their conspiracy through these "alliances" with the purpose and effect of carrying out their illegal price-fixing and output scheme.  In fact, TYG said in a 2004 Taiwan Economic News article that, "*Tong Yang does not compete with its major rivals— all from Taiwan, but has been trying to form a strategic alliance to jointly develop the world's largest single market*."  Defendants' engagement in what they called "alliances" provided mechanisms to enter into conspiratorial agreements to jointly develop and market AM Sheet Metal Parts and exchange confidential pricing and output information to increase market power and raise profits.  Defendants' conspiracy worked.  Defendants make up 95% of the total American AM Sheet Metal Parts market and enjoy high profit margins.

34. Defendants are or previously have been members in a variety of "alliances." In July 2003, a "strategic alliance" was implemented encompassing Taiwan's major AM Sheet Metal Part manufacturers with the goal of artificially manipulating the U.S. market by restricting competition through joint mold and die development and confidential information exchange. Alliance members include TYG and Defendants Tong Yang, Jui Li and Gordon. By 2004, one Taiwanese auto parts maker claimed that the ratio of jointly developed molds and dies had risen to about 80% and was expected to surpass 90% if the level of cooperation continued to proceed smoothly.

35. Semon Chen, former president of Tong Yang's predecessor, TKY, stated that the alliance partners agreed to develop and share about 80 sets of dies for AM Sheet Metal Parts, thus transforming, at least in part, their former competition into cooperation and expanding Taiwan's share of the global auto-parts market. Before the alliance, Defendants manufactured these dies separately and competed for sales of the parts to the Class. Defendant Jui Li's vice president, Lee Jun-de, admits that makers of the alliance expected to assure a 20% or higher margin for their exports to the U.S. Defendant Gordon reported record high revenues in 2004 and 2005 due to the strategic alliance and its Vice President, Pan Ming-Hsiung, attributed the company's "lucrative" operations to the industrial alliance with other manufacturers in Taiwan, which "*effectively ended the price-cutting competition*."

36. By 2005, this joint die and mold "alliance" was coined as the "Joint Die-Development Project." Gordon executive Sonny Pan admitted that his company had a development agreement with other Defendants, as opposed to competing with them, thus reducing capacity and choice for the U.S. market. Indeed, the investment expense was reduced to one-third, while profits increased and price competition was eliminated.

37.     These record high revenues were not enough for Defendants; they wanted more. Defendants Gordon, Tong Yang, API and Jui Li formed a "Tooling Alliance" in April 2004, also called the "Unified Tooling" program.  Defendants entered agreements that required them to invest a share of the cost of developing the tools used for pressing sheet metal parts.   The average price of such tools range from $200,000 to $400,000.  Defendants agreed further to stop competing with different tools and work out a production arrangement that ended competition and ensured pricing to customers would not fall below agreed levels.  While these agreements were in effect, Defendants' profits largely escalated.  Defendant Gordon's profits rose from 15% to 27.75%.   Defendant Tong Yang's profits rose higher than 19%.   In 2006, the "Tooling Alliance" agreement was renewed at Defendant Jui Li's suggestion and Defendants Gordon and Tong Yang agreed, sharing the profit equally on more than 30 sets of tools.

38.     In October 2005, Defendants organized yet another "strategic alliance" to enhance cooperation and avoid "malicious" price-cutting competition.  The alliance was organized to further strengthen Defendants' market information collection, supply-chain management, negotiating power with foreign customers, and to otherwise increase consolidation of international market power by Defendants. A sophisticated international marketing strategy, away from exclusive reliance on low prices to attract customers, was implemented.  Alliance members include Defendants Tong Yang, Jui Li and API.

39.     In November of 2006, Defendants jointly set up a cooperative arrangement with Taiwan's steel maker, China Steel Corp. ("CSC").  Together, the Defendants and CSC planned to spend at least US$1.96 million in technology development and expected to increase the revenue generated from AM Sheet Metal Parts exports (but not necessarily the volume) by about US$210.84 million per year, for a total of over US$813 million per year.  CSC Technical Vice

President Chen Yu-song pointed out that the thrust behind the new alliance was to make their downstream customers (Defendants) more profitable and in turn trigger more purchases from CSC. Participants would experience upgraded engineering techniques and expedited development process, therefore limiting competition in the AM Sheet Metal Parts market. Alliance members include Defendants Gordon, API, Tong Yang and Jui Li.

40.     Defendants facilitated their conspiracy through these alliances with the purpose and effect of illegally fixing output and setting prices among Defendants. Defendants used the alliances as opportunities to collude on AM Sheet Metal parts, especially those sold in the United States, including California.

41.     During the time Defendants engaged in their cooperative arrangements, Defendants abandoned competing to take market share from one another through cutting prices and began cooperating with each other to illegally increase profits. Defendants exchanged confidential pricing information and mapped out comprehensive price fixing and output agreements, including limiting supply. Defendants did this because reducing supply increased Defendants' ability to inflate prices and increase their profit margins. *One Defendant manufacturer claimed that prior to 2003, most Taiwan manufacturers engaged in hard-fought price competition but this resulted in prices that were hardly above cost, and led to extremely thin profit margins. As a result, Defendants conspired to illegally set prices to increase profit.*

42.     Defendants' anticompetitive conduct continues today. TYG, for example, lists "consolidate AM market through mergers and strategic alliances" as a "strategic direction" in a July 2009 company profile report.

*Conspiratorial Meetings*

43. Since at least 2003, Defendants met and agreed to increase prices simultaneously and limit output. They did this by exchanging confidential pricing information and enforcing penalties for the Defendants that cheated on the agreements. For example, in March 2004, Defendants agreed to institute a price hike for AM Sheet Metal Parts sold into the United States, the specific purpose of which was to increase Defendants' margins to 20% to 30%. Defendants falsely attributed the rising prices to the rising cost of steel.

44. Defendants also routinely met and agreed, since at least 2003, on a floor price at which they would sell AM Sheet Metal Parts to buyers in the U.S. and a floor price at which they would sell those same Parts to each other. In order to enforce the price-fixing agreement, Defendants instituted penalties for any company that sold below those prices.

45. Defendants conspired further to increase the prices of selected parts dramatically. These joint export price hikes were cleverly applied to parts that had the highest potential for competition because they were the products most likely to experience price erosion as a result of that competition. Defendants raised prices by 5% to 15% for items that suffered weak competitiveness and produced with jointly developed molds and dies. The increase for highly competitive items, such as doors, fenders and engine hoods, most of which the companies produced with their own molds and dies, were as high as 100%.

46. In fact, Gordon's own financial statements suggest that the average selling price of its AM Sheet Metal Parts increased 106% during the class period.

47. On March 13, 2008 in Taipei, Taiwan, Defendants met to discuss their joint pricing and compare their current prices with the prices from the last time they met. At the meeting, Defendants agreed on prices among themselves along with their effective dates: "(i) the

new price applies to orders made after March 10(including); (ii) if orders are made between Feb 1 to March 9, but delivery date is after April 1 (including), the new price will also apply; (iii) if orders are made between Feb 1 to March 9 and delivery date is before March 31, the old price shall still apply. The new cost will be negotiated and fixed before March 25, [2008]."

48.     Defendants monitored adherence to their illegal agreements to enforce their agreement and avoid price-cutting competition. Defendants required involvement in a comprehensive production scheme, under which each company was assigned to produce parts for car models. The scheme was expected to push profit margins up to 30% from the current level of under 10% and raise prices for consumers.

***Unified Tooling Production Arrangement***

49.     Defendants did not limit their artificial manipulation of the relevant market to price agreements. Defendants further effectuated their anticompetitive conspiracy by agreeing to limit capacity and reduce output of AM Sheet Metal Parts. Sonny Pan, president of Defendant Gordon, said that Defendants decided to rebuild the production and marketing order for Taiwan-made sheet metal parts sold in the U.S. and set up a similar production/marketing negotiation mechanism to avoid overlapped production.

50.     As mentioned earlier, Defendants created what is called the "Unified Tooling" program. Under this scheme, Defendants agreed to stop producing AM Sheet Metal Parts that competed with other Defendants to reduce capacity for those products in the relevant market. Instead, by idling some Defendants' tools and/or dies that produced certain AM Sheet Metal Parts, production of those Parts were limited to one or two of the producer Defendants. Thereafter, all orders from Plaintiff and the Class members for any such product that was

produced from "Unified Tooling" were filled with "Unified" Parts that were produced by only one or two of the Defendants.

51. Defendants would provide a new pricing scheme for such "Unified" Parts. When the parts became "Unified," their costs dramatically increased and all Defendants sold them at the same fixed price or price range.

52. Defendants have admitted that prices for "Unified Tooling" parts would be much lower if they were allowed to compete against each other, but that they could not offer lower prices without violating the terms of the price fixing agreement with their competitors.

53. The number of AM Sheet Metal Parts that fell under the "Unified Tooling" program increased exponentially during the Class Period, from a couple dozen early on to more than 1000 today. This means that at least 20% of all AM Sheet Metal Parts with currently active SKUs sold in the United States, including in California, fell under the "Unified Tooling" arrangement or program, and the number continues to rise.

54. The intended effect of the "Unified Tooling" arrangement was to artificially manipulate the U.S. market for AM Sheet Metal Parts in order to reduce and/or eliminate competition and increase the prices for those Parts.

55. The actual effect of the "Unified Tooling" arrangement or program on the prices of AM Sheet Metal Parts was profound; prices increased dramatically, by as much as three or four times the pre-Unified price, or more. Solely by way of non-exclusive example (because Defendants' conspiracy affected multiple, if not thousands of, AM Sheet Metal Parts), a Chevy Cavalier fender that could be purchased from a Defendant for US$9 before it became "Unified" was US$42 after; a Ford Focus hood that was approximately US$63 before it became a "Unified Tooling" was over US$95 after.

56. The goal of Defendants' conspiracy was to increase their profit margins by two to three-fold. The conspiracy was successful. Overall, prices for products that became part of the "Unified Tooling" program increased in price from 20% to 100% and profit margins increased during the Class Period as a result.

### The Conspiracy's Upward Effect on Revenue

57. Defendants' adherence to their conspiracy had immediate and substantial results. The years leading up to the commencement of Defendants' conspiracy were met with severe competition in the AM Sheet Metal Parts market, eventually incentivizing them to fix prices and control output. Perhaps most significant was a 1999 Illinois class action against State Farm insurance that had a dramatic effect on the aftermarket automotive parts market. In 1999, a jury awarded plaintiffs over $1 billion in damages and punitive damages against State Farm for breaching contracts with policy holders when it required the use of non-original equipment parts, including AM Sheet Metal Parts, in the repair of vehicles damaged in crashes. In the wake of this award, automotive insurance companies suspended the use of AM Sheet Metal Parts in their repairs. The North America market, which includes California, for AM Parts dropped by about 40% in 2000, resulting in challenging times for Taiwan AM Part suppliers, including Defendants.

58. In fact, in 2000, only 69% of automotive body repair shops in the United States reportedly used and installed AM Sheet Metal Parts.

59. Accordingly, Defendants were motivated to coordinate and maintain their conspiracy because of its dramatic upward effect on revenues. Defendants' revenues jumped considerably each year during their conspiracy. As a result of the conspiracy, Tong Yang saw a

successive rise in sales, ranging from US$60.7 million in 2003 to US$156.7 million in 2005 to US$184 million in 2008—a 260% improvement with steady and significant annual increases. Defendants Gordon, Jui Li, and API saw similar sales growth during those years.

60.     TYG reported revenues from US$124.7 million for the first seven months of 2004, up 10.04% from the year before, a record high.  Defendants Gordon and Tong Yang also reported record highs in 2004 as a result of the strategic alliance in joint die/development and product/marketing and sales.  For instance, Defendant Tong Yang reported revenues of US$13 million in July alone and US$77.5 for the first seven months of 2004, up 42.81% and 17.4%, respectively, from the year before.

61.     In 2005, Defendant Gordon's revenues increased to US$83.6 million, a 300% increase from 2003. By 2008, Defendant Gordon brought in revenue of US$100.5 million. Gordon attributed its increase in earnings and revenue to its strategic alliance with its local counterparts.  Similarly, Defendant Jui Li saw its revenues go from US$48.4 million to US$126.2 million, another 260% improvement, over the same period.

62.     By 2008, 97% of automotive body repair shops in the United States reportedly used and installed AM Sheet Metal Parts.

<u>**AM SHEET METAL PART MARKET CONDITIONS<br>FURTHER SUPPORT A CONSPIRACY**</u>

*High Barriers to Entry*

63.     There are significant barriers to entry in the market for AM Sheet Metal Parts that facilitated Defendants' collusion as described herein.  These barriers to entry include: (a) established market positions of the incumbent Defendants; (b) collusive business culture among Taiwanese manufacturers of AM Sheet Metal Parts including Defendants; (c) substantial

research and development costs; (d) development and maintenance of a robust distribution system; (e) investment in large tools and dies that can create or "stamp" sheet metal into proper product shapes; and (f) lower design costs based on Defendants' willingness to engage in acts of unfair competition related to patent, trade secret and other intellectual property infringement.

64.     Defendant Gordon Vice President Sonny Pan stated that the aftermarket parts business requires large and continuous injections of cash into the development of molds and dies. TYG, which includes Tong Yang itself, identified the AM Sheet Metal Parts industry as having a number of "High Entry Barriers" that make the relevant market extremely difficult for new entrants to penetrate. The entry barriers noted specifically by TYG in its 2006 company overview include:

- High capital costs: The cost of developing one tooling set is estimated to be around US$150,000 to US$180,000;

- Limited available capacity of tooling plants: It is therefore difficult for competitors to secure available tooling development capacity;

- Long development cycle for tooling sets: The average time required for developing one tooling set is established to be 6 months;

- Characteristics of small quantity but multi-type products supply: The ability to offer complete product line-up of collision parts is required to meet global demand of one-stop ordering;

- Quality certification system: CAPA & MQVP systems in North America; and

- Tooling accumulations: Major manufacturers in this industry have more than 20 years experience and have accumulated thousands of toolings.

65.     These substantial barriers to entry facilitated the conspiracy because they enabled Defendants to set supra-competitive prices without fear that new entrants would, or could, come into the market and undercut those prices.

66.     Even if a would-be competitor sought to enter the market, it could not survive because Defendants conspired to temporarily cut the prices of the competing parts sold by the new market entrant.  In addition, the need to obtain various quality certifications for AM Sheet Metal Parts makes it difficult for a would-be competitor with new products to compete.  Once the would-be competitor is sufficiently undercut and eliminated from the market, Defendants resume their conspiracy to artificially raise prices.

*Quality Certification*

67.     The two certification systems in North America used by Defendants include CAPA and MQVP.  Statistics compiled by the Insurance Research Committee show that U.S. consumers are much more likely to use non-OEM parts if they bear marks showing CAPA or MQVP approval.  Some insurance companies require them.  Further, certification of AM Sheet Metal Parts is a challenge because it may ostensibly require even higher levels of quality and safety than is required for OEM parts; therefore, Defendants' obtaining of CAPA certification facilitated the maintenance of the illegal price-fixing scheme described herein, as it created further barriers to entry and limited competition.

68.     The Certified Automotive Parts Association ("CAPA") is a non-profit organization established to develop and oversee a test program guaranteeing the suitability and quality of automotive parts. It ostensibly includes a detailed review and inspection of a participant's factory and manufacturing processes, followed by an analysis conducted by an independent testing laboratory. The factory and parts continue to purportedly be subject to random inspection by CAPA to ensure quality standards. All Defendants are participating manufacturers in the CAPA certification program and prominently display, advertise and promote their approval as CAPA-certified parts manufacturers.  In April 2009, Defendant

Gordon was recognized by CAPA with an award for providing the U.S. market with the most CAPA parts in 2008.

69.     Manufacturers' Qualification and Validation Program ("MQVP") is another certification program for the quality and safety of non-OEM parts sold in the United States.  The program outlined policies and quality-management practices designed to ensure that repair parts are equal to original parts in form, function, durability and appearance.  Defendants Tong Yang, Gordon Taiwan and Jui Li are participating manufacturers in the MQVP certification programs.

70.     These certification systems are another example of the many entry barriers into the AM Sheet Metal Parts market, which enabled Defendants to engage in their conspiracy without fear of competition from a new market player.

*A Highly Fungible Product*

71.     AM Sheet Metal Parts are a highly fungible product because the manufacturers offer essentially the same products for the same vehicles: hoods, fenders, bumpers, doors, etc.  Specifically, AM Sheet Metal Parts are assigned interchangeable part numbers, whereby a single part number is assigned to a sheet metal product manufactured by several Defendants.  For example, when a customer orders a replacement part for a particular make and model of an automobile, the customer typically does not request a certain manufacturer or have a preference whether the part comes from Defendant Tong Yang, Gordon, API or Jui Li because all AM Sheet Metal Parts are seen as interchangeable by customers.

72.     Absent the alleged conspiracy, purchasers of AM Sheet Metal Parts would have selected a manufacturer based on price, and Defendants would have competed, as they did in the distant past, largely on price.  Price fixing is particularly effective in highly fungible markets for which adequate substitutes do not exist.

*Lack of Available Substitutes*

73.     There are no reasonably interchangeable substitutes for AM Sheet Metal Parts. AM Sheet Metal Parts constitute a market distinct from parts supplied by third parties to vehicle manufacturers for incorporation into new vehicles, and also distinct from the market for OEM parts made by the manufacturers of automobiles, or for those manufacturers by third parties.

74.     AM Sheet Metal Parts prices are much lower than OEM part prices.  There is a significant difference in the wholesale price, often as large as 50%-100%, between an OEM part and a comparable AM Sheet Metal Part.  In fact, most insurance carriers who supply coverage for automobile collisions require automotive body shops to purchase and use aftermarket products on repairs paid for by the insurance carriers.  Nationwide Mutual Insurance Co., and Allstate Insurance Co. are two of the largest carriers that require the use of AM Sheet Metal Parts.  The Property and Casualty Insurers Association of American found that non-OEM parts save about $2.8 billion in insurance costs every year.  Accordingly, AM Sheet Metal Parts and OEM parts are not reasonably interchangeable substitutes from the point of view of the purchaser and are not in direct and substantial competition with each other.

75.     For these reasons, and others more fully set forth in this Complaint, the lack of reasonably interchangeable substitutes facilitated the conspiracy because it enabled Defendants to set supra-competitive prices without fear that customers would switch to other alternatives.

*Inelastic Demand*

76.     For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.  Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to

buy altogether. Demand is said to be "inelastic" if an increase in the price of a product results in only a small, if any, decline in the quantity sold of that product. Demand for AM Sheet Metal Parts is inelastic. In other words, consumers have nowhere to turn for alternative, cheaper products of similar quality and so they continue to purchase AM Sheet Metal Parts despite a price increase. As described in detail above and throughout this Complaint, customers for AM Sheet Metal Parts simply lack close substitutes.

77.     Inelastic demand for AM Sheet Metal Parts meant that it was profitable for the cartel to fix output and raise prices.

## DEFENDANTS' ANTITRUST VIOLATIONS

78.     Defendants are, and were at all relevant times, horizontal competitors at the manufacturing level. Defendants sold and continue to sell their products indirectly to Plaintiff and to Class Members in California. Defendants, individually and collectively, have conspired to fix the prices of, limit the output of, and artificially manipulate the market for AM Sheet Metal Parts throughout United States, including in California.

79.     Beginning at least as early as January 1, 2003 and continuing up to the present, Defendants and their co-conspirators combined and conspired to unreasonably restrain competition for AM Sheet Metal Parts sold in the United States, including in California, in violation of federal antitrust law and state antitrust and common laws.

80.     The purpose and effect of Defendants' price fixing conspiracy has been to eliminate competition among and between themselves and to eliminate customer choice by establishing artificially high and noncompetitive prices for AM Sheet Metal Parts in the United States, including in California. This price fixing agreement constitutes a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and California's antitrust laws.

81.     From at least January 1, 2003 through the present, Defendants engaged in extensive price fixing of AM Sheet Metal Parts. Defendants' unlawful conspiracy had the effect of, among other things, raising the prices of those products, reducing capacity and eliminating competitors from the market, thereby further restraining trade in the importation, distribution and sale of AM Sheet Metal Parts throughout the United States, including in California.

82.     Defendants conspired and cooperated with each other during the Class Period to escape price competition in the AM Sheet Metal Parts market, thus achieving very high profitability.

83.     Defendants' illegal scheme resulted in decreased supply and objectively calculable inflated prices to Plaintiff and Class members in California. This result is the type of injury that the antitrust laws were designed to prevent.

## ANTI-COMPETITIVE EFFECTS OF VIOLATION ON PLAINTIFF AND THE CLASSES

84.     The conduct of Defendants described herein has produced antitrust injury, and unless restrained, will continue to produce the following anticompetitive effects, among others:

    (a)     Competition in the importation, distribution and sale of AM Sheet Metal Parts in the United States, including in California, has been, and continues to be, substantially and unreasonably restricted, lessened, foreclosed and eliminated;

    (b)     barriers to entry into the production, distribution and sale of AM Sheet Metal Parts in the United States, including in California, have been raised;

    (c)     prices for customers seeking AM Sheet Metal Parts in the United States, including in California, have risen and will continue to do so;

    (d)     customers seeking AM Sheet Metal Parts in the United States, including in California, are, and will be, deprived of choice with respect to price and vendor/manufacturer; and

(e)    the importation, distribution and sale of AM Sheet Metal Parts in the United States, including in California, will continue to be artificially restrained.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

85.    Throughout the Class Period, Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

86.    Defendants falsely attributed the cause for the price increases as higher input costs, such as the costs of steel from sources in the U.S. and China, with the intention of concealing the true nature of their coordination.

87.    Neither Defendants nor their co-conspirators told Plaintiff or other Class members that they were fixing prices or setting output. Accordingly, Plaintiff and Class members could not have discovered the violations alleged herein until shortly before filing this Complaint. Defendants and their co-conspirators conducted their conspiracy secretly, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.

88.    Defendants and their co-conspirators engaged in a successful price-fixing conspiracy, which they affirmatively concealed by, *inter alia*: (a) meeting secretly to discuss prices, customers and markets of AM Sheet Metal Parts sold in the United States, including California, and elsewhere; (b) using methods of communication in furtherance of the alleged conspiracy that were designed to avoid detection; (c) giving pretextual reasons for price increases on AM Sheet Metal Parts; and (d) agreeing among themselves at meetings and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme.

89. For example, Defendants repeatedly blamed increasing steel prices as a reason for increasing AM Sheet Metal Part prices. The truth, however, was that the cost of sheet metal purchased by Defendants as an input for AM Sheet Metal Parts did not correspond to the Defendants' price increases for AM Sheet Metal Parts. Defendants used steel prices as a subterfuge for the true reasons behind their price increases during the Class Period.

90. Moreover, Defendants' other costs of production, like labor costs, fell during the Class Period.

91. As a result of Defendants' and their co-conspirators' fraudulent concealment, all applicable statutes of limitations affecting the Plaintiff and the Classes' claims have been tolled. Plaintiff and the various Class members did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws. Plaintiff could not have discovered the existence of the combination and conspiracy alleged herein at an earlier date by the exercise of reasonable due diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection and affirmatively conceal such violations.

92. Because the contract, combination, or conspiracy was kept secret by Defendants, Plaintiff was unaware of the fact that prices of AM Sheet Metal Parts were secretly raised, fixed, maintained or stabilized as alleged herein.

93. As a result of the fraudulent concealment of the conspiracy, Plaintiff asserts the tolling of the applicable statute of limitations affecting the causes of action by Plaintiff and the members of the various Classes.

## CLASS-ACTION ALLEGATIONS

94.     Plaintiff brings this action on behalf of herself and as a class action under the provisions of Rule 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Classes:

### Nationwide class for injunctive relief under Rule 23(b)(2)

All people and entities that from January 1, 2003 through present indirectly paid for all or part of the purchase price of AM Sheet Metal Parts for end use in the U.S. from one or more Defendants.

### California class for money damages under Rule 23(b)(3)

All people and entities that from January 1, 2003 through present indirectly paid for all or part of the purchase price of AM Sheet Metal Parts for end use in California from one or more Defendants.

Excluded from these classes are Defendants; the officers, directors or employees of any Defendants; any entity in which any Defendant has a controlling interest; and any affiliate legal representative, heir or assign of any Defendant.

95.     Plaintiff purchased AM Sheet Metal Parts during the Class Period and is therefore a member of the California class, as well as the Nationwide Class.

96.     The total number of Class members in each class is so large that individual joinder of all members of the respective Classes is impracticable.

97.     Plaintiff's claims are typical of the claims of the members of the Classes, since Plaintiff and all members of the Classes purchased AM Sheet Metal Parts during the class period alleged herein, her claims arise from the same course of conduct, and the relief sought is common.

98.     Plaintiff will fairly and adequately represent and protect the interests of the

members of the Classes as her interests are typical of the rest of the Classes and she has no conflict with other Class Members. Plaintiff has retained experienced and competent counsel.

99. Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting solely individual members of the Classes. Among the questions of law and fact common to the Classes are:

(a) Whether Defendants engaged in a contract, combination or conspiracy among themselves to fix, maintain, or stabilize the price of AM Sheet Metal Parts sold in the United States, including California;

(b) Whether the conduct of Defendants caused the prices of AM Sheet Metal Parts to be artificially inflated in the United States, including California;

(c) Whether Defendants engaged in a contract, combination, and/or conspiracy to restrict output of AM Sheet Metal Parts sold in the United States, including California;

(d) Whether Defendants' conduct caused injury to the members of the Classes and, if so, the proper measure of damages;

(e) Whether Plaintiff and the other members of the Classes are entitled to, among other things, injunctive relief, and if so, the nature and extent of such injunctive relief; and

(f) Whether Defendants undertook actions to conceal the unlawful contract, combination or conspiracy described herein.

100. Joinder of all members of the classes is not possible, the claims of individual Classes members are too small to justify an individual action, and a class action is superior to other methods for the fair and efficient adjudication of this controversy.

101. Class certification of the respective, alternative classes is appropriate under Rule 23(b)(3) of the Federal Rules of Civil Procedure because a class action is the superior procedural vehicle for the fair and efficient adjudication of the claims asserted given that:

(a) Common questions of law and fact overwhelmingly predominate over any individual questions that may arise among or within the respective, alternative classes and, consequently, enormous economies to the court

and parties exist in litigating the common issues on a class-wide basis or, alternatively, bases, instead of on a repetitive individual basis or, alternatively, bases;

(b) Each individual class member's damage claim is too small to make individual litigation an economically viable alternative, and few class members have any interest in individually controlling the prosecution of separate actions;

(c) Class treatment is required for optimal deterrence and compensation and for limiting the court-awarded reasonable legal expenses incurred by class members; and

(d) Despite the relatively small size of each individual class member's claim, the aggregate volume of their claims, whether considered in a national class or, alternatively, California, coupled with the economies of scale inherent in litigating similar claims on a common basis, will enable this case to be litigated as a class action on a cost-effective basis, especially when compared with repetitive individual litigation, and no unusual difficulties are likely to be encountered in this class action's management in that all legal and factual questions are common to the class or, alternatively, classes.

102. Class certification is appropriate under Federal Rule 23(b)(2) because Defendants acted on grounds generally applicable to Plaintiff and the Nationwide class members, all of whom are at imminent risk of irreparable harm by continuing to pay supra-competitive prices for AM Sheet Metal Parts.

## COUNT I
### (Applicable to the Nationwide Class)
### Violation of 15 U.S.C. § 1

103. Beginning at least as early as January 1, 2003, Defendants, their agents and co-conspirators engaged in a continuing contract, combination or conspiracy to suppress and eliminate competition by fixing the prices of AM Sheet Metal Parts. The contact, combination or conspiracy engaged in by Defendants and their co-conspirators was an unreasonable restraint of interstate and foreign trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

31

104.     In particular, Defendants have combined and conspired to raise, fix, maintain or stabilize prices of AM Sheet Metal Parts sold in the United States.

105.     The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants, their agents and/or their co-conspirators, the substantial terms of which were to agree to fix the prices of AM Sheet Metal Parts.

106.     As a result of Defendants' unlawful conduct, prices for AM Sheet Metal Parts were raised, fixed, maintained, and stabilized in the United States.

107.     For the purposes of formulating and effectuating the charged contract, combination, or conspiracy, Defendants, their agents and co-conspirators did those things they contracted, combined, or conspired to do, including, among other things:

(a)     Participating in meetings, conversations and communications to discuss the prices and supply of AM Sheet Metal Parts;

(b)     Communicating in writing and orally to fix prices of AM Sheet Metal Parts;

(c)     Agreeing, during those meetings, conversations and communications, to manipulate and set pre-determined prices and supply of AM Sheet Metal Parts sold in the United States in a manner that deprived indirect purchasers of free and open competition in the market;

(d)     Issuing price announcements and price quotations in accordance with agreements reached;

(e)     Selling AM Sheet Metal Parts to indirect purchasers in the United States at non-competitive prices, which were then passed on to indirect purchasers;

(f)     Providing false statements to the public to explain increased prices for AM Sheet Metal Parts; and

(g)     Exchanging information on sales of AM Sheet Metal Parts, for purposes of monitoring and enforcing adherence to the agreed-upon prices.

108.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the other members of a Nationwide Class have been injured in their businesses and property in that they have paid more for AM Sheet Metal Parts than they otherwise would have paid in the absence of Defendants' unlawful conduct.

109.     Plaintiff and the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

### COUNT II
### (Applicable to California Class)
### Violation of Cal. Bus. & Prof. Code § 16720

110.     During the Class Period, Defendants engaged in an unfair method of competition in California commerce and in unfair and deceptive acts or practices in California commerce by fixing AM Sheet Metal Parts' prices.  Defendants' conspiracy lessened full and free competition in AM Sheet Metal Parts' importation and sales into California; restrained, suppressed, and eliminated competition in California; and fixed, raised, stabilized, and pegged AM Sheet Metal Parts' prices at artificially high and non-competitive levels in California, all in violation of Cal. Bus. & Prof. Code §16720.

111.     Defendants' conspiracy (a) caused Defendants to fix, raise, maintain, and stabilize AM Sheet Metal Parts prices; (b) caused Defendants to allocate AM Sheet Metal Parts customers and markets; and (c) caused Plaintiff and the other California class members to pay higher prices for AM Sheet Metal Parts that they indirectly purchased from Defendants.

112.     In formulating and effectuating their conspiracy, Defendants and their co-conspirators:

(a)     Met to discuss AM Sheet Metal Parts customers and markets;

(b)     Agreed to charge prices at certain levels and to increase or maintain prices

for AM Sheet Metal Parts sold in California;

    (c)    Issued price announcements, quotations, and charged prices consistent with their illegal agreement; and

    (d)    Allocated AM Sheet Metal Parts markets and customers consistent with their illegal agreement.

113.    Defendants' conspiracy had the following effects:

    (a)    AM Sheet Metal Parts price competition was restrained, suppressed, and eliminated throughout the U.S., including in California;

    (b)    AM Sheet Metal Parts prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the U.S., including in California;

    (c)    Plaintiff and the other California class members that indirectly purchased AM Sheet Metal Parts were deprived of free and open market competition and were injured; and

    (d)    Plaintiff and the other California class members paid more than they otherwise would have for AM Sheet Metal Parts that they purchased indirectly.

114.    Defendants' conspiracy has substantially affected commerce within California and constituted an unfair method of conduct.

115.    During the Class Period, California class members indirectly purchased millions of dollars of Defendants' AM Sheet Metal Parts in California from Defendants. As a direct and proximate result of Defendants' violations of the Cal. Bus. & Prof. Code §16720, Plaintiff and California class members paid significantly more for Defendants' AM Sheet Metal Parts than they would have paid absent Defendants' illegal combination and conspiracy, and, as a result, Plaintiff and California class members were injured in their businesses and property and have suffered damages in amounts presently undetermined.

## COUNT III
### (Applicable to California Class through Plaintiff)
### Violation of Cal. Bus. & Prof. Code § 17200

116.     During the Class Period, Defendants intentionally suppressed and, unknown to Plaintiff and California class members, committed, and continue to commit, acts of unfair competition, as defined by § 17200 *et seq*. of California Business and Professions Code, commonly known as the Unfair Competition Law.

117.     Defendants' conduct as alleged herein violated § 17200.  Defendants' acts, omissions, misrepresentations, practices and non-disclosures constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of §17200 *et seq*., including, but not limited to:

    (a)     The violations of § 16720 *et seq*., as set forth above;

    (b)     Defendants' acts, omissions, misrepresentations, practices and nondisclosures, as described above, whether or not in violation of § 16720;

    (c)     Defendants' unfair, unconscionable, unlawful, and/or fraudulent concerted or independent acts;

    (d)     Defendants' acts and practices that were and are unfair to California consumers of AM Sheet Metal Parts, within the meaning of § 17200; and

    (e)     Defendants' acts and practices that are fraudulent or deceptive within the meaning of § 17200.

118.      Plaintiff and California Class Members are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that Defendants may have obtained as a result of their illegal business acts or practices.

119.     Defendants' illegal conduct alleged is continuing and no indication exists that they will not continue such activity into the future.

120. Defendants' unlawful and unfair business acts have caused and continue to cause Plaintiff and California Class Members to pay supra-competitive and artificially inflated prices for AM Sheet Metal Parts.

121. Plaintiff California Class Members have suffered injuries-in-fact and have lost money or property as a result of Defendants' acts of unfair competition.

122. Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by their unfair competition.

123. Pursuant to § 17203, Plaintiff is entitled to equitable relief, including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that Defendants obtained as a result of their illegal business practices.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter judgment in the class members' favor and against Defendants, as follows:

    A.    With respect to Count I, that this action may be maintained as a Nationwide class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure and certification of a Nationwide class for injunctive relief is appropriate;

    B.    With respect to Count I, that this Court permanently enjoin Defendants from conspiring to fix AM Sheet Metal Parts' prices and allocating AM Sheet Metal Parts' markets or other injunctive relief as this Court deems appropriate;

    C.    With respect to Counts II-III, that this action may be maintained as a California class for statutory and/or common-law violations, as deemed appropriate, under Rule 23(b)(3) of the Federal Rules of Civil Procedure and that certification of these classes is appropriate;

    D.    With respect to Count II, that Defendants' conspiracy violated Cal. Bus. & Prof. Code § 16720 and that compensatory damages, including treble damages, are appropriate under Cal. Bus. & Prof. Code § 16750;

E.  With respect to Count III, that Defendants violated Cal. Bus. & Prof. Code § 17200 and that disgorgement on a collective basis to California class members, respectively, is appropriate, pursuant to § 17203;

F.  With respect to all Counts, that this Court award Plaintiff post-judgment interest, their costs, and reasonable attorneys' fees; and

G.  With respect to all Counts, that this Court order any other relief as it deems just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all triable issues.

Dated:  August 21, 2013                           Respectfully submitted,

                                                   */s/ John C. Cabaniss*

                                                   John C. Cabaniss
                                                   **CABANISS LAW, SC**
                                                   839 North Jefferson Street
                                                   Milwaukee, WI 53202
                                                   Telephone: (414) 220-9211
                                                   Facsimile:  (414) 220-9214
                                                   Email:        john@cabanisslaw.com

                                                   Brad Yamauchi
                                                   Derek G. Howard
                                                   **MINAMI TAMAKI, LLP**
                                                   360 Post St., 8th Floor
                                                   San Francisco, CA 94108
                                                   Telephone: (415) 788-9000
                                                   Facsimile:  (415) 398-3887
                                                   E-mail:        dhoward@minamitamaki.com

                                                   Daniel J. Mulligan
                                                   **JENKINS MULLIGAN & GABRIEL, LLP**
                                                   660 Market Street, 3rd Floor
                                                   San Francisco, CA 94104
                                                   Telephone: (415) 982-8500
                                                   Facsimile:  (415) 982-4518
                                                   E-mail:        dan@jmglawoffices.com

                                                   Counsel for Plaintiff

38